[S. F. No. 5070. Department Two.—April 17, 1909.]

In the Matter of the Estate of JOHN W. THOMAS, Deceased. B. F. THOMAS et al., Contestants of Will, Respondents, JOHN R. YOUNG, Executor, Proponent, Appellant.

ESTATES OF DECEASED PERSONS—WILL OFFERED FOR PROBATE—CONTEST FOR FORGERY SUSTAINED—NEW TRIAL—AMENDMENT OF STATEMENT. —When a contest of a will of a deceased person offered for probate for alleged forgery has been sustained, and proponent has moved for a new trial and improper matter has been incorporated in the settled statement, an application of contestants made under section

473 of the Code of Civil Procedure within six months after the settlement of the statement to set it aside and to amend the statement on the ground that it does not truly represent the case, was properly granted, in order to make it speak the truth. It was the duty of the trial court to see that the settled statement, which the appellate court is called upon to review, comports with verity.

ID.—SUPPORT OF VERDICT AND FINDING AS TO FORGERY OF WILL.—*Held,* upon a review of the evidence, that it is amply sufficient to sustain the special verdict of the jury and the findings of the court in accordance therewith, that the proposed will was forged.

ID.—ADMISSIBLE EVIDENCE—KNOWLEDGE BY TESTATOR OF FACTS INCONSISTENT WITH PROPOSED WILL—AGE AND RELATIVES—WRITTEN AND ORAL DECLARATIONS.—Where the proposed will stated that deceased was eighty-four years of age, and that he had only one known relative, a nephew, Benjamin Thomas, residing in Portland, Oregon, his declaration as to the date of his birth, showing that he was only eighty-one years old, and an undated holographic will found at his bedside, making bequests to a brother and sister named, residing in the State of New York, and to a niece and other nephews named, including Benjamin F. Thomas, "residing in Modesto, Cal.," and his letters showing that he maintained an intimate correspondence with and knowledge of his relatives, and other oral declarations showing like knowledge, were all admissible to show that the testator knew of the existence of facts at variance with the statements contained in the proposed will.

ID.—DECLARATIONS NOT GOING TO TESTAMENTARY INTENT—PROVINCE OF JURY.—Such declarations go only to establish knowledge, and not testamentary intent, and it is left to the jury to draw the inference as to the probability or improbability of a testator having such knowledge, falsifying the facts in the proposed will.

ID.—TRIAL OF ISSUE AS TO FORGERY—DECLARATIONS NOT PART OF RES GESTÆ TO PROVE ISSUE—COUNTER AUTHORITY.—There is a strong counter current of authority by which it is held that when the issue is forgery, declarations of the testator, even as to his testamentary intent, though forming no part of the *res gestæ*, will be received as tending to prove the issue, though it is not necessary to adopt that rule in this case.

ID.—DEATH OF TESTATOR—BEST EVIDENCE OF KNOWLEDGE.—The testator being dead, no higher evidence of his knowledge of facts inconsistent with the statements contained in the contested will could be had than that evidenced by his own writings; but, since the state of mind of a testator may always be shown by his declarations, as a part of that state of mind, his knowledge may also be so shown.

ID.—EXPERT EVIDENCE—COMPARISON OF HANDWRITING—PROPER REFUSAL OF REQUESTED INSTRUCTION.—A requested instruction for the proponent of the will, that "In a case involving the comparison of different writings, where the question is one of resemblance or

similarity, an ordinary individual can arrive at a conclusion quite as correct as that of the opinion of the most skilled expert in handwriting. Jurors have a right to use their eyes as well as their ears in such a case, and may differ in their conclusions from the opinion of the expert witness," was properly refused, the first part of the instruction being unqualified, and not supported by reason or authority, and the second part of the instruction, as to the province of the jury, having been substantially embodied in the instructions of the court.

ID.—USE OF MAGNIFYING GLASS IN JURY ROOM—EXAMINATION OF MEMORANDUM BOOK AS EXHIBIT.—It was not misconduct in the jury room for the foreman of the jury to examine with a magnifying glass a memorandum book kept by the proponent's attorney, and to inform them what he observed in the use of the same, where such memorandum book was an exhibit in the case, and it is not shown that such glass had not been used in the court room, or that its use was improper.

APPEAL from an order of the Superior Court of Santa Clara County denying a new trial. M. H. Hyland, Judge.

The facts are stated in the opinion of the court.

B. A. Herrington, and William A. Bowden, for Proponent, Appellant.

Sullivan & Sullivan, Theo. J. Roche, and William B. Hardy, for Contestants, Respondents.

HENSHAW, J.—A purported will of the deceased was offered for probate. A contest was instituted before probate, it being alleged that the purported will was a forgery. Issue was joined, trial was had before a jury upon the special issue propounded in the following interrogatory: "Did the deceased, J. W. Thomas, subscribe his name to the instrument purporting to be his last will and testament filed in this court on the 8th day of December, 1905?" The jury answered "No." The court adopted this special verdict and made findings against the validity of the will, and by its decree denied it probate. John R. Young, the proponent of the will and named therein as sole executor, moved for a new trial. A statement for use on the motion was settled and filed October 14, 1907. Thereafter, on October 30, 1907, before the decision upon the motion for a new trial, the contestants served notice on proponent and his attorneys of a motion to

set aside the certificate to the statement and to amend the statement, upon the ground "that the statement now on file does not truly represent the case." A hearing was had upon this motion, evidence was by the court taken, and the court "being satisfied that said statement is inaccurate and does not truly represent the case, orders that the certificate of the judge appended to said engrossed statement be and the same is canceled and set aside. The court thereupon further orders that said statement be amended as follows." The statement as filed contained declarations to the effect that the court had refused to give certain instructions, and that to its refusal the proponent had duly excepted; whereas, in fact, the record established that the proposed instructions had been given. Objection is made that the court was without power so to amend the statement, or, if it had the power, that it was error to amend it under the procedure taken. The application of the contestants was to set aside the certificate and to amend the bill. The application was made within six months after the settlement of the bill, and thus within the time contemplated by section 473 of the Code of Civil Procedure. The form which contestants adopted was not only in itself proper, but is the form expressly sanctioned by this court in *Swett* v. *Gray*, 141 Cal. 63, [74 Pac. 439], where it is said: "The proper course, perhaps, would have been as taken in *Warner* v. *Thomas etc. Cleaning Works*, 105 Cal. 409, [38 Pac. 960], namely, to move the court to vacate the settlement and allowance of the statement, with leave either to reingross the same, and place the proposed amendments therein, or to have them deemed to be so reingrossed, settled and allowed." The application not only does not do violence to the decision of this court in *Merced Bank* v. *Price*, 152 Cal. 697, [93 Pac. 866], but conforms in all respects to the requirements and rules of practice there indicated. One of the principal purposes of such a statement is that it shall speak the truth upon matters which an appellate tribunal may be called upon to review. It was, therefore, not only proper for but the duty of the trial court to see that the statement which it settled comported with verity.

Upon November 7, 1905, John W. Thomas, an aged man of eighty-two years, died in the city of San Jose. On the

13th of November the public administrator filed a petition for letters, as in case of intestacy. On the 24th of November B. F. Thomas, a nephew of deceased, petitioned for letters of administration. Thereafter, on December 8, 1905, the will here declared a forgery was presented for probate by John H. Young. The will was a typewritten instrument. Proponent offered evidence tending to show that it was prepared in the office of William A. Bowden, an attorney at law, and was there signed by the deceased and published and declared to be his last will and testament in the presence of the subscribing witnesses, Bowden and Mrs. Young, proponent's wife. There were certain circumstances which at once caused suspicion to arise concerning the validity of this instrument. Young was not related to Thomas, had known him only since June, 1904, when he made his acquaintance for the purpose of effecting a loan of six hundred dollars from him, which loan he never repaid. He subsequently borrowed three hundred dollars, which he asserts that he repaid, though Thomas's papers give no evidence of this. He knew that he was named as executor of the will, he was the custodian of the will, the will declared that the only relation of the deceased was a nephew residing in Portland. The newspaper to which Young was a subscriber contained an account of the sickness and death of Thomas, but at no time before or after the funeral did Young appear at the Thomas house, and the will was not presented by Young for probate until the full statutory period of thirty days had elapsed. The will gave to Young two thousand dollars and named him as executor without bonds. It declared Thomas to be of about the age of eighty-four, when in fact he was at its date not eighty-two. The will made the testator declare that "the only relation that I know anything of at the present time is a nephew, Benjamin Thomas, who resides at Portland in the state of Oregon, or resided there when I last heard from him." In fact, it was shown and appeared from various letters and papers of the deceased, that he had numerous relatives, that he kept in constant communication with them, and followed with great interest and particularity the progress of their lives. Moreover, when Thomas was found ill unto death by Mrs. Hellen, a witness upon the contest, she also discovered a document lying face downward

on the stand by the side of the sick man's bed. This paper was in form a holographic will, wholly written and signed by the deceased, lacking only the date to give it validity under the statute. That instrument, after making provision for the payment of his debts and funeral expenses, provided as follows:—

"Second: After such payment, I give to Amelia Nolting two hundred dollars.

"Third. I give, devise and bequeath all the property real and personal and effects of every name and nature which I now have may disposed of or entitled to; one third to my brother T. F. Thomas, Hermitage, Wyoming County, New York. One third to my sister Anna T. Perry, South Richland, Oswego County, New York. One third to my nephews and a niece herein named to be equally divided between them and their heirs and assigns forever, B. F. Thomas, Modesto, California, R. B. Thomas, Lacon, Illinois. I make, constitute and appoint B. F. Thomas of Modesto, Stanislaus County, California, to be my executor of my will and to act without bonds of this my last will and testament, hereby revoking all former wills by me made.

"In witness whereof, I have hereunto subscribed my name and affixed my seal.          J. W. THOMAS."

There was thus a statement in the testator's own handwriting showing a very intimate knowledge of his relatives and their whereabouts—a statement in flat contradiction to his purported declaration in the will of July 11, 1905. This holographic instrument, it was shown, had been in existence for three years, which the more conclusively established that this knowledge of his relatives could not have been acquired after July 11, 1905, the date when, by the purported will, he declared that he knew nothing of them or their whereabouts. Letters of the deceased were forthcoming, showing that he maintained an intimate correspondence with and knowledge of his relatives, and, finally, the testimony of many witnesses, experts, and those familiar with the handwriting of the deceased, went to establish that his signature to the purported will of July 11th was forged and fraudulent. All these matters were shown in evidence against the validity of the alleged

will, with many more facts and circumstances to the same end, not necessary here to consider. For it will not be contended, and indeed is not contended, that the evidence was not sufficient to justify the verdict of the jury and the judgment of the court. It is insisted, however, that for certain erroneous rulings upon the admission of this evidence the court should have granted a new trial, and to the consideration of these matters we now come.

Questions calling for the declarations of the testator were admitted over objection, the following serving to illustrate their character:—

"Q. What statements, if any, did he (the testator) make to you about his relations?

"A. He said he had a number of relations and that he intended to treat them all alike.

"Q. What did he state to you with reference to the date of his birth?

"A. He told me he was born August 21, 1823.

"Q. State to the jury what he said to you concerning his relations, that is who his relations were and where they resided?

"A. He told me that he had relatives in the East, and spoke of his brother and his sister Annie. He spoke of her about two weeks before he died. He told me that he wanted his relations to inherit his property."

In addition, written declarations of the testator, expressed in letters, proved to be in his handwriting, and in the holographic will above quoted, were received in evidence. All of this evidence was admitted over objection, and it is here contended that it was improperly admitted. It is the general rule, recognized by the great weight of authority and accepted in this state, that the declarations of a deceased, when forming no part of the *res gestæ* of the testamentary act, are not admissible for or against the genuineness or validity of the instrument, saving in the two cases where the question for determination is that of the testator's sanity or that of undue influence. In both these instances the underlying principle is the same. The declarations are then admitted, not in proof or disproof of any statement of fact contained in them, but as tending to show the condition or state of mind of the

declarant, this condition or state of mind having a direct and important bearing upon the disputed question of his mental capacity or of the execution of the will under undue influence. They are not admitted in proof or disproof of the matter embraced in the declaration. "These declarations are to be admitted, not in any manner as proof of the truth of the statements declared, but only for the purpose of showing thereby what in fact was the mental condition, or in other words the mental capacity of the testator at the time when the instrument in question was executed." (*Throckmorton* v. *Holt*, 180 U. S. 552, 572, [21 Sup. Ct. 454].) That such is the accepted rule in this state will be seen by a glance at the *Estate of Gregory*, 133 Cal. 131, [65 Pac. 315], and *Estate of Arnold*, 147 Cal. 583, [82 Pac. 252]. But, however, it must be conceded that there is a strong counter current of authority by which it is held that where the issue is forgery, declarations of the testator, even as to his testamentary intent, though forming no part of the *res gestæ*, will be received as tending to prove the issue. The whole subject is learnedly considered and the cases upon either side collated by the supreme court of the United States in *Throckmorton* v. *Holt*, 180 U. S. 552, 572, [21 Sup. Ct. 474], and the occasion here requires nothing more than a citation to the complete and exhaustive discussion which is there had, after which that court adopts the rule as in this state it exists. But in the generality of cases the courts have had to deal with declarations such as those in *Throckmorton* v. *Holt*, where the improbability that the deceased would have made the testamentary disposition in the will attacked is sought to be shown by declarations establishing his affection for an omitted friend or relative, or his dislike of a person or relative who has been the recipient of his bounty, and, generally, where the state of his affections and his testamentary intent are sought to be established by such evidence, consisting of either oral testimony or of the testator's writings. Such evidence, as we have said, is not admissible. But the evidence here offered is of different character and stands upon an entirely different plane. It is not attempted here to show by the declarations of the testator the probability that he entertained a different testamentary intent from that expressed in his purported will. What is sought to be shown

is the actual *knowledge* of the testator at the time of the making of the purported will; that this knowledge was at variance with statements made as *facts* in the will, leaving the jury to draw the inference as to the probability or improbability of a testator, with this knowledge, so falsifying in so solemn an instrument as his last testament. The declarations go to establish knowledge and not testamentary intent, and they do not at all come within the reason of the rule which excludes such declarations in other cases. Thus, if a testator should declare in his purported will that "I make no provision for my sister Anne, knowing that she has predeceased me," and the fact was and could be shown by the testator's own letters and the replies thereto that he was in correspondence with this sister before and after the date of the purported will, it would certainly be evidence (and after the death of the testator the strongest possible evidence) that he knew that his sister Anne was alive at the date when his purported will caused him to declare his belief in her death. So here, two statements of alleged fact are found in the purported will, the one that the testator was at its date eighty-four years old, the other that "the only relation that I know anything about at the present time is a nephew named Benjamin Thomas, who resides at Portland in the state of Oregon, or resided there when I last heard from him." As to the first of these declarations contestant undertakes to show by the deceased's oral declarations that the latter's knowledge and belief at the date of the will was that he was not eighty-four years old, but eighty-one, leaving it as a matter of legitimate inference for the jury to say whether he spoke falsely in declaring to his friends his age, or whether it was more likely that the false statement was that contained in the purported will; in other words, leaving this evidence as a legitimate aid to the jury in determining whether or not the will was forged, whether or not it was probable or improbable that the testator would make in that instrument statements so at variance with his knowledge of the facts. The second point in controversy is the statement of fact to the effect that the testator had knowledge of only one relative, whereas he had a very intimate knowledge of the names and residences of other relatives; that the only relative of whom he knew

was Benjamin Thomas, who resided in Portland "when last I heard from him"; whereas, in fact, this nephew, to the testator's knowledge, did not reside in Portland when he last heard from him, but did reside in San Francisco, California. Upon these matters it would not be sufficient for the contestant merely to establish the fact that Thomas had other relatives, or the fact that the nephew resided in San Francisco. It was essential that the proof should go further, and, if possible, establish the knowledge of the testator of these facts, always for the purpose of allowing the jury to draw the inference as to the probability or improbability of a testator, with such knowledge, having made the false or erroneous statement contained in the will. The testator being dead, no higher evidence of such knowledge could be had than that evidenced by his own writings, and all of this evidence directed to these ends was therefore unquestionably admissible, pertinent and proper. It was indirect and secondary evidence, but under the circumstances of the case it was the highest character of evidence possible to be adduced. Since the state of mind of a testator may always be shown by his declarations in a proper case, as a part of that condition or state of mind there may also be shown his knowledge. This determination does not include the improper admission of declarations touching testamentary intent which do not fall within the recognized rule. The evidence here was plainly addressed to the question of the testator's knowledge. Thus, the latter portion of the answer to the first question above quoted was open to objection—that portion of the answer where the testator is said to have declared that he intended to treat his relatives all alike—but the question itself was pertinent, and such portion of the answer as was objectionable would doubtless have been stricken out on motion.

Complaint is made of the refusal of the court to give certain proposed instructions, but the amended statement discloses that these instructions were actually given. The court refused, however, to direct the jury as follows:—

"7th. In a case involving the comparison of different writings where the question is one of resemblance or similarity, an ordinary individual can arrive at a conclusion quite as correct as that of the opinion of the most skilled expert in handwrit-

ing. Jurors have a right to use their eyes as well as their ears in such a case, and may differ in their conclusion from the opinion of the expert witness."

Appellant declares that the proposed instruction has received the sanction of this court in *People* v. *Storke,* 128 Cal. 486, [60 Pac. 1090], and that the refusal to give it was therefore error. In *People* v. *Storke* the charge was libel and consisted of the sending of scurrilous anonymous letters. An attempt was made to fasten the authorship of these letters on one Gutierrez and exemplars of Gutierrez's handwriting had been admitted in evidence for the purpose of comparison with the libelous letters. Subsequently the district attorney moved to strike out all of these exemplars on the ground that there had been no independent evidence connecting Gutierrez with the writing of the disputed and libelous matter. The court granted the motion. In discussing the ruling this court said *arguendo:* "In a case involving a comparison of different writings, the ordinary individual can frequently arrive at a conclusion quite as correct as that of the opinion of the most skilled expert in handwriting, particularly where, as in this case, this expert testified that there was no resemblance or similarity." The court in this language was not laying down a rule of law, but was engaged in argumentative consideration. In saying that the ordinary individual can *frequently* arrive at as correct a conclusion as can an expert, it may perhaps be said that there was something of an overstatement of the fact. Certainly, in the majority of instances the mind of the expert and trained observer, disciplined to discern not only obvious dissimilarities, but to detect as well actual dissimilarities disguised under the appearance of similitude, will arrive at a result more correct than will that of the untrained observer. But, aside from this, the proposed instruction contains no qualification at all and goes far beyond the language of this court in declaring that an ordinary individual can arrive at a conclusion quite as correct—a declaration which this court has never made and which is supported neither by reason nor authority. Moreover, upon the question of the weight to be accorded to the expert testimony and the jury's right and power in judging such evidence, the instructions were full. Thus, to quote but one of several instructions, the court declared as follows:—

"Generally the testimony of experts will not be allowed to overthrow the positive and direct evidence of credible witnesses who testify from their personal knowledge. While the law permits in certain cases expert testimony in reference to handwriting to be given, yet such testimony should be received with great caution, and the jury are at liberty to reject it if they should find it not well founded in fact. The jury is at liberty to use their own judgment in the matter of handwriting, and are not obliged to follow the opinion of experts."

Upon motion for new trial affidavits were introduced to the effect that a memorandum book or diary purporting to have been kept and written by William A. Bowden, attorney for proponent, had been taken to the jury room, submitted to inspection under a magnifying glass by the foreman of the jury, who then argued to his fellow jurors that the name "Thomas" had been interpolated in the book after the trial of the cause. These statements were met by counter affidavits on the part of the foreman and certain of his fellow jurors denying these allegations. It appears that the memorandum book was an exhibit in the case and, as such, the jury was entitled to take it and inspect it and make investigation and comparison of the writing therein contained. (Code Civ Proc., sec. 1944.) It is not shown that the magnifying glass, if one was used, had not also been employed in the courtroom in the examination of exhibits, but even if it were, we would not hold that the employment of this mechanical device by the jurors in aid of their investigation of handwritings was illegitimate or improper.

For the foregoing reasons the order appealed from is affirmed.

Melvin, J., and Lorigan, J., concurred.

Hearing in Bank denied.